Filed 8/17/21  P. v. Hampton CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C086081 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF170000011) |
| v. | |
| GARY GRANT HAMPTON, JR., | |
| Defendant and Appellant. | |

Convicted of multiple sexual offenses against his ex-wife, and sentenced to over 26 years in state prison, defendant Gary Grant Hampton, Jr., appeals contending the trial court erroneously denied his retained counsel's request to withdraw shortly before trial, and improperly admitted his ex-wife's prior consistent statements to the sexual assault examination nurse regarding the charged assault and to a police officer concerning a prior domestic violence incident between the couple.  Based on recent legislative changes enacted while his appeal was pending, defendant argues we should remand the matter to the trial court to allow it the opportunity to exercise newly granted discretion to strike the

1

five-year prior serious felony enhancement, and direct the court to strike the three 1-year prior prison term enhancements for which he no longer qualifies. In supplemental briefing, defendant asserts the trial court abused its discretion in not granting a continuance to allow defendant to retain new counsel.

We reject defendant's contentions challenging the trial court's rulings during trial. As to the arguments based on two legislative changes enacted during his appeal, we shall remand the matter to the trial court. We affirm defendant's convictions and remand the matter for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 2017, defendant was charged with sodomy by force (Pen. Code, § 286, subd. (c)(2)(A), count 1),[1] sexual intercourse by force (§ 261, subd. (a)(2), count 2), sexual intercourse by any intoxicating or anesthetic substance (§ 261, subd. (a)(3), count 3), and infliction of corporal injury upon a spouse or cohabitant (§ 273.5, subd. (f)(1), count 4). For counts 1 and 2, the information alleged defendant committed the offenses by means of kidnapping with a substantial increase of fear or harm (§ 667.61, subd. (d)(2)), kidnapping (§ 667.61, subd. (e)(1)), and administration of a controlled substance (§ 667.61, subd. (e)(6)). For counts 1, 2, and 3, it was alleged that defendant had a prior serious felony conviction (§ 667, subd. (a)) for a domestic violence offense within the meaning of section 243, subdivision (d).[2] For all four counts, it was alleged that defendant had a prior strike conviction (§ 1170.12, subds. (b) & (c)), and had served three prior prison terms (§ 667.5, former subd. (b)). Defendant pleaded not guilty to the charges and allegations. The case was tried to a jury, and the following evidence was adduced at trial.

---

[1] Further undesignated statutory references are to the Penal Code.

[2] Defendant admitted the prior domestic violence conviction.

2

Defendant and Jessica D. married in 2006 while he was in jail, and share four children together. They divorced in 2009, but continued to have a tumultuous, on-again off-again relationship with episodes of domestic violence.

Jessica testified that in December 2016, she and defendant were not together and they had not seen each other for about a month. After defendant reached out, they began communicating again to discuss how they might coparent their children; some of their conversations were flirtatious and included sexual innuendos. They made plans to spend New Year's Eve together to celebrate Jessica's birthday.

In the early morning hours of December 30, Jessica texted defendant and asked him to come watch a movie at her apartment; the messages alluded to having sex.[3] Defendant arrived at Jessica's apartment around 3:00 a.m. They lay down together, and defendant stayed the night. She denied that they had sexual relations, and did not remember telling a responding officer that they had kissed that night. A few hours later, Jessica went to work in Oroville signing income-qualifying individuals up for free cell phones through her employer, Life Wireless.[4]

The following day, on December 31, 2016, Jessica dropped her children off with her mother, and went to work in Colusa, again signing individuals up for free cell phones. Defendant either went with her, or he showed up later in the day and helped her for several hours. After she finished her shift, they went to a house in Yuba City so Jessica could get a tattoo. Jessica did not get the tattoo, however, and she and defendant went to

---

[3] Jessica testified she was joking about the sex.

[4] Jessica denied that defendant accompanied her to Oroville; defendant testified he went with her to Oroville and helped her work.

a convenience store in Marysville where they purchased a bottle of brandy and soda that they planned to drink at her apartment before they went out for the evening.[5]

Upon returning to Jessica's apartment, defendant at first was "cordial." After talking for a while, however, defendant asked about her friend Javier. He questioned whether she was seeing him and how often he had been to her apartment. He grabbed her cell phone and demanded to know why she had listed him in her contacts as "Alex," and had deleted messages from him. He also took a phone her mother had let her borrow for work, so she no longer had access to any phones in the house.

Defendant took Jessica into her daughter's bedroom, threw her on the bed and straddled her; he began choking her while saying he was going to kill her. She struggled to remove his hands from her neck so she could breathe. He then led her into the bathroom.

Defendant closed the bathroom door and refused to let Jessica leave. He began looking through her phone again and questioning her. He periodically punched her in the head, and forced her to drink the alcohol they had purchased earlier. He also threatened to choke her with a belt in the bathroom. At some point, Jessica lost consciousness.

She testified that she awoke sometime later the next day in the front passenger seat of her car with a big rock on her lap, and defendant's sunglasses on her face. The car was parked in front of defendant's cousin's house in Olivehurst. She was dressed in a robe and jeans without any underwear, and was disoriented; she felt like someone had had sexual intercourse with her. She saw defendant's cousin, Osakwe Newsome, outside

---

[5] Video surveillance from the All Rite Market in Marysville showed Jessica and defendant purchasing liquor and a two-liter soda bottle around 8:45 p.m. on December 31, 2016.

4

with defendant.[6] She did not get out of the car because her whole body ached, and she could barely see out of her eye. She begged defendant to take her to the hospital.

Defendant responded that Jessica's mother had been calling, and he told her to text her mother that they would pick up the children by 6:00 p.m. He said they would tell her that Jessica got really drunk and got into a fight with another woman. He handed her the phone, and Jessica secretly texted her stepfather, "please call" or "[h]elp me." She then texted her brother "call 911." She quickly deleted the text messages so defendant would not see them, and texted that she would pick up the children around 6:00.[7] Defendant then took the phone away.

Jessica asked defendant what had occurred the previous night, and he told her that she was "wild." She did not know what he meant, but understood him to mean that he had done something sexually to her.

Defendant drove them back to Jessica's apartment. He ordered her into the apartment, and she complied because she was afraid he would kill her if she attempted to escape. Once inside, he closed and locked the door.

---

[6] Newsome testified that defendant was at his house for several hours, and that Jessica remained in the car the entire time. He was unsure if she was conscious. When defendant returned to the car, Newsome saw them argue, claiming they both accused each other of cheating. Jessica testified that defendant told her Newsome's girlfriend, Telisa Johnson, had seen her in the car and thought she was dead. Johnson denied telling defendant that Jessica looked dead, but acknowledged she was asleep in the car and that she looked sick or hung over. Before they left, Johnson said Jessica and defendant argued over whether she had cheated on him.

[7] Jessica's brother testified that around 2:30 p.m. on January 1 he received a text message from her stating, "call the cops now." He showed the text message to his mother and stepfather. Jessica's brother responded to the text around 3:30 p.m., and never received a response back. Neither he nor his mother called the police at that time. Jessica's stepfather testified that he received two text messages from Jessica around the same time that day. The first text said, "help, 911," and the second said, "I will pick up the kids at 6:00."

Defendant told Jessica to take a bath because she had thrown up on herself. While in the bath, defendant took a syringe and, over her objection, injected Jessica with what she believed was methamphetamine, although he told her it was medicine that would help her.[8] She immediately felt like her face was on fire. She got out of the bathtub and walked naked to her room to lie down; defendant followed and injected her a second time, telling her she "need[ed] more." Defendant then turned her over and sodomized her; he also had vaginal intercourse with her. She told him to stop. After Jessica thought he ejaculated, defendant sat on the bed and stared out the window saying, "They are lining up out there. They are here for me."

Sometime later, Jessica heard a knock on the front door. She wrapped herself in a comforter and answered the door. Her stepfather had come to check on her after she failed to show up to pick up her children. She told him to call the police. He called the police, and Jessica reported that defendant had held her captive in her apartment.

When officers arrived, Jessica was crying, and the left side of her face was swollen and bruised; she did not appear to be wearing any clothing underneath the blanket wrapped around her. After obtaining her consent to enter her apartment, officers called to defendant, but he did not respond. Using a police K-9, they eventually located him hiding underneath the bed in the master bedroom; defendant was naked except for a black jacket.

Defendant was taken into custody and treated for a dog bite at the hospital. During a police interview there, Detective Thomas Oakes documented scratches on defendant's face that he said Jessica inflicted during the incident. Defendant at first claimed Jessica's eye was injured and swollen shut from leaning against the car window for a long period of time when she was passed out. He then claimed that she fell twice

---

[8] Drug paraphernalia, including a syringe, was later recovered from Jessica's apartment.

while throwing up, and that at one point their heads hit when he was holding her up. He denied hitting her, but did say he put her in a "bearhug" while she was "flipping out" because she was so drunk. When Detective Oakes noted that Jessica claimed the sex was not voluntary, defendant responded, "How is it not voluntary sex? I got four kids with this person . . . ."

Defendant was interviewed a second time at the jail where he said Jessica was so "shit-faced" drunk that she would not have known they had sex until he said something. He also said that she was so drunk that she was not able to walk. Defendant then told Detective Oakes that because Jessica was his "wife" she did not tell him no and essentially consented to sexual relations. He was unable to explain how she got a black eye; he again claimed he only bear hugged her during the episode.

Jessica was taken to the hospital for a sexual assault examination. The parties stipulated that rectal and cervical samples taken during the examination showed the presence of defendant's sperm. Photographs of injuries and bruising to her eye, ear, neck, arm, wrist, knees, and legs were taken during the examination and shown to the jury. Jessica's blood and urine samples were positive for methamphetamine. The samples were not tested for alcohol.[9]

A few weeks following the incident, while defendant was in jail awaiting trial, officers confiscated a "kite," or note, defendant attempted to pass to another inmate. The kite stated in part, "You know how my wife is. You know I'm not capable of doing this shit she alleged. I beat a ho [quick], but come on, Crip, you know, don't leave me hanging like this. Get at me. Come to the hole. Or me, you, info for you bounce. Love you, Cuz."

---

[9] Jessica's blood was drawn at 10:18 p.m. on January 1, 2017. Criminalist Daniel Coleman testified that for an average sized female it would be unlikely to find alcohol still in the system 22 hours after ingestion.

The prosecution also introduced evidence of prior domestic violence incidents between defendant and two other women.[10] Defendant physically assaulted and strangled both victims. He later denied that some of these prior domestic violence incidents had occurred, or that they occurred in the manner in which the other witnesses testified.

In defense, defendant called Anthony Love, a lifelong friend who admitted having multiple felony convictions,[11] to testify. According to Love, he saw defendant and Jessica on New Year's Day, and defendant asked him if he could obtain methamphetamine to smoke. When Love went into an apartment to retrieve the drugs, he heard a commotion outside and saw his wife and Jessica fighting; his wife was on top of Jessica, slamming her head into the ground. After breaking up the fight, defendant and Jessica left; Love met them a short time later and they smoked methamphetamine in their car. When passing the pipe to Jessica, defendant accidentally burned her ear. Love also testified that about five days earlier, on December 27, 2016, he saw Jessica at a drug

---

[10] Yuba City Police Department Sergeant Michelle Brazil testified that in 2002 Angelina V. reported defendant grabbed her ponytail and put her head between his knees, squeezing so she could not breathe; he also used his arm to put her in a chokehold. At trial, Angelina V. did not remember the incident, although she remembered reporting some sort of domestic violence incident to police. Defendant later admitted that he grabbed Angelina and put her head between his legs, but claimed he was not trying to hurt her; he denied hitting or strangling her.

In March 2014, defendant strangled S.G., who was unavailable to testify at trial. A responding officer observed bruising and redness on S.G.'s neck. Defendant's sister-in-law told law enforcement that she saw defendant get angry with S.G. when she came home late, and that they argued and he physically assaulted her. Defendant admitted he argued with S.G., but denied that he choked her. Defendant, however, pleaded no contest to inflicting a corporal injury on a cohabitant (§ 273.5) based on the incident.

[11] Love and defendant were incarcerated in the same pod for a period of time before trial where they conversed about the prison time defendant was facing in the present matter.

8

house (defendant's uncle's house) trying to purchase methamphetamine and they went back to her house to smoke the methamphetamine.

Defendant also testified on his own behalf. He admitted he had been convicted of five previous felonies.

Defendant testified that he met Jessica at a party shortly after being released from prison. At the party, he also met Jessica's sister. Approximately three weeks later, he had sexual relations with Jessica's sister, and then the next day, slept with Jessica as well. Defendant also claimed that Jessica had slept with his brother shortly before they were married, but repeatedly lied about it.

Regarding the New Year's Eve incident, defendant claimed that he and Jessica engaged in several sexual acts. According to him, they had consensual sex in the early morning hours of December 30, shortly after he arrived at her apartment, as well as on the morning of December 31 and again later that evening when they returned to Jessica's apartment after she finished work.

After drinking the brandy and soda they had purchased together, they left her apartment in search of a party. During the drive, Jessica continued to drink the brandy by herself.

Upon returning to her apartment, they had sex again and Jessica continued to drink the brandy. At some point, defendant went to take a shower and Jessica joined him and unsuccessfully tried to perform oral sex on him. Afterwards, defendant smoked methamphetamine on the bed; Jessica was next to him and he "playfully" burned her on the buttocks with the smoking pipe.

Defendant testified that the next morning, he and Jessica went for a drive to buy more drugs.[12] While searching for drugs, Jessica became angered when she saw

---

[12] Surveillance video from Lally's Food Mart showed defendant arriving in Jessica's Ford Explorer to purchase cigarettes on January 1, 2017.

9

defendant talking to Love's wife; Jessica and the woman fought. Later, on the way to defendant's cousin's house in Olivehurst, defendant accidentally burned Jessica with the drug pipe a second time on her ear.

After returning to Jessica's apartment, she tried to inject herself with methamphetamine while in the bathtub, but needed defendant's help. When they got to bed, defendant injected Jessica again and then injected himself.

Defendant testified they engaged in consensual vaginal and anal sex. He denied that Jessica ever told him no or to stop; he denied that he forced her to use methamphetamine or to have sex with him. He also claimed that he never struck her with his fist.

Defendant repeatedly claimed that Jessica was a liar, that she testified falsely, and that she had made up the entire incident. None of her testimony, according to defendant, could be believed.

In October 2017, the jury found defendant guilty of counts 3 and 4, but was unable to reach a verdict on counts 1 and 2, and those counts were dismissed. The trial court found defendant suffered a prior strike, a prior serious felony conviction, and had served three prior prison terms. In November 2017, the court sentenced defendant to an aggregate term of 26 years 8 months in state prison. The court imposed the upper term of eight years for count 3, doubled to 16 years for defendant's strike prior, plus five years for a prior serious felony enhancement (§ 667, subd. (a)) and one year for each of his three prior prison term enhancements. The court also imposed a consecutive two-year eight-month sentence for count 4. Defendant timely appealed.

## DISCUSSION

## I

### *Motion to Withdraw as Counsel*

Defendant contends the trial court erred in denying his retained attorney's motion to withdraw shortly before trial, thereby violating his constitutional right to counsel and

to present a defense.  We conclude the trial court did not abuse its discretion in denying the motion, nor was defendant's right to counsel or to present a defense infringed.

*A.*     *Additional Background*

Defendant was originally represented by appointed Deputy Public Defender John Abril.  In a confiscated letter to his mother from jail, defendant wrote that he wanted to fire Abril and the only way to achieve that would be to spit in his face or attempt to attack or stab him in open court.  Given defendant's letter, Attorney Abril was relieved and Deputy Public Defender Robert Romero took over on defendant's behalf.  On March 13, 2017, defendant made a *Marsden* motion[13] to relieve Romero, arguing Romero had failed to subpoena certain Life Wireless customers of Jessica who he claimed would testify that he was with her while she worked in the days leading up to the incident.  Defendant asserted such testimony was relevant to impeach Jessica because she had allegedly denied that defendant was with her during her preliminary hearing testimony.

Romero explained that defendant had threatened him, and that he disagreed tactically over the relevancy of the evidence defendant sought.  He also noted that a majority of the items on defendant's discovery list had either been obtained or had been subpoenaed or investigated.  Despite defendant's threats, and their tactical disagreements regarding a few discovery issues, Romero remained comfortable representing defendant as long as he was properly restrained during trial.  The court denied the motion, finding defendant and Romero merely disagreed on trial tactics.

On April 20, 2017, defendant made a second *Marsden* motion to dismiss Romero. He again complained about various discovery issues, including obtaining jail phone calls between he and Jessica on another pending case in Sutter County, and the results of any alcohol tests on Jessica after the incident.  Counsel explained that he had subpoenaed the

---

[13]  *People v. Marsden* (1970) 2 Cal.3d 118.

Sutter County jail phone records, and that medical records showed Jessica's blood-alcohol level was zero. Counsel had already submitted the blood-alcohol issue to his expert. Defendant also complained that counsel had not contacted various witnesses; counsel explained that his investigator had tried to track down all the witnesses defendant requested, but some could not be found and others refused to give a statement. Counsel assured the court that he continued with his investigative efforts to locate and interview the witnesses. The court denied the *Marsden* motion, but granted defendant's *Faretta* motion to represent himself.[14]

On May 3, 2017, privately retained attorney Christopher Carlos substituted in as defendant's counsel. Three weeks before trial, on August 17, 2017, Carlos filed a request to be relieved as counsel, citing a breakdown in the attorney-client relationship. At a hearing on the withdrawal request, Carlos stated that he believed defendant had reported him to the State Bar, which was an automatic conflict that prevented him from continuing to represent defendant. Defendant, however, informed the court that he had not filed a bar complaint against Carlos.

Carlos acknowledged that the only reason he took defendant's case, which he now believed was a mistake, was because he grew up with defendant's father. According to Carlos, he could no longer represent defendant given his behavior; whenever they met, defendant would scream at him, threaten him, and tell him everything he was doing was wrong. He noted defendant believed certain witnesses should testify at trial even though Carlos believed there was no legal basis to call the proposed witnesses.

Defendant told the court that he wanted to call multiple witnesses who allegedly would testify that Jessica flips out or loses her mind when she drinks liquor. He wanted to call his cousin to testify that he saw Jessica drink a whole pint of Hennessey and

---

[14] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562].

remembered the whole event. He wanted to call a toxicology expert to testify about why Jessica was able to remember the evening with his cousin but have no memory of the present incident.

After noting that it was unlikely a toxicologist could provide the type of testimony defendant sought and questioning whether such testimony would even be admissible at trial, the court encouraged Carlos to contact a toxicologist to explore the issue and offered to cover the expense of the consultation.

At that point, defendant indicated that he wanted to retain new counsel and provided the name of an attorney, Mani Sidhu, who allegedly was willing to represent him.[15] That attorney, however, was not present in court. Given the closeness of trial, the court declined to substitute an absent attorney who might agree to represent defendant.

Unhappy with the court's ruling, defendant threatened to report Carlos to the State Bar that night. The court then pointed out that defendant was again threatening his own attorney. After his initial remarks, Carlos did not further address the court regarding the issue.

---

[15] After briefing was complete, defendant filed a motion to augment the record with the transcript of a hearing that supposedly took place around the same time in which defendant asked to substitute a different attorney, Grady Davis, as his counsel. We granted counsel's request to augment the record with any hearing during the relevant time period where the trial court addressed or denied Grady Davis's request to represent defendant, if it existed. The trial court clerk and court reporter subsequently reported that they located no hearing where the trial court denied or addressed Attorney Grady Davis representing defendant. We consider only the evidence that is contained in the record on appeal, and shall disregard any claim, unsupported by the record, that the trial court erred in not substituting Attorney Grady Davis to represent defendant. (*People v. Waidla* (2000) 22 Cal.4th 690, 743 [" 'Appellate jurisdiction is limited to the four corners of the record on appeal . . . .' "].)

13

At a hearing on September 8, 2017, Carlos declared a doubt as to defendant's competency. The prosecutor argued that defendant was simply manipulating the system to try to delay his impending trial.

Doubtful that the defense had presented sufficient evidence to require the court to hold a Penal Code section 1368 hearing, the court allowed Carlos to call Dr. Paul Weuhler, a clinical psychologist, to testify regarding whether he believed defendant was incompetent after speaking with him for less than an hour before the hearing. During their brief interview, defendant claimed he now heard voices and thought law enforcement was out to get him because his cell had been searched. Dr. Weuhler conceded that defendant had told his mother in a recorded conversation that he was frustrated and was just going to have to say he did not know what a judge was, and did not know what a prosecutor or defense attorney were supposed to do. He also acknowledged that defendant had recently written a cohesive letter to the judge that appeared reasonable, which undermined defendant's claim of incompetency. And defendant had written a potential witness outlining what he wanted the witness to tell his investigator regarding the facts in order to have certain charges dismissed.

After considering Dr. Weuhler's testimony and the evidence presented at the hearing, the court found insufficient evidence to doubt defendant's mental competence. In so ruling, the court found defendant to be "actually quite sophisticated in his knowledge of the criminal justice system." According to the court, defendant adeptly understood and articulated the Evidence Code section 402 hearing process, and had "superb knowledge of other evidentiary issues, including relevance, expert testimony, the impeachment, incompetence, [and] physical-restraint issues." Defendant was able to describe particular witnesses and know whether their statements were, or were not, helpful. He also had the "ability to evaluate the merits of pieces of evidence or the benefit of particular witnesses."

On the first day of trial, Carlos renewed his motion to withdraw, arguing he was unable to effectively communicate with defendant.  The court found that while defendant might be difficult, he could communicate with counsel about the case; in the court's view, it appeared defendant was improperly trying to delay trial.  The court denied the motion.

Carlos represented defendant during trial.  Based on his defense, the jury was unable to reach a verdict as to counts 1 and 2, and those counts and the attached allegations were dismissed.

B.     Analysis

1.     *Right to Assistance of Conflict-free Counsel*

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution." (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).)  A necessary corollary to this constitutional right is the right to representation free from any conflict of interest that undermines counsel's loyalty to his client.  (*Ibid.*, citing *Glasser v. United States* (1942) 315 U.S. 60, 69-70 [86 L.Ed 680]; *People v. Douglas* (1964) 61 Cal.2d 430, 436-439.)  " 'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' "  (*Doolin,* at p. 417.)

We evaluate state and federal conflict of interest claims using the same standard.[16] (*Doolin, supra*, 45 Cal.4th at p. 421; *Mickens v. Taylor* (2002) 535 U.S. 162, 166

---

[16]  Citing *People v. Frye* (1998) 18 Cal.4th 894, defendant incorrectly argues that to show a violation of the California Constitution based on conflicted counsel, a defendant need only demonstrate a potential conflict that supports an informed speculation that the

[152 L.Ed.2d 291].)  As a category of ineffective assistance of counsel claims, a defendant must show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different.  (*Doolin,* at p. 417; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674].)

The deficient performance prong is satisfied where evidence shows defense counsel labored under an *actual* conflict of interest that affected counsel's performance as opposed to a mere theoretical division of loyalties.  (*Doolin, supra*, 45 Cal.4th at p. 417; *Mickens v. Taylor, supra*, 535 U.S. at p. 171.)  Whether counsel's performance was " 'adversely affected' " requires the court to evaluate whether counsel " ' "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict.  [Citation.]  In undertaking such an inquiry, we are . . . bound by the record,' " but also consider whether arguments or actions omitted would likely have been made by counsel without a conflict of interest, and whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.  (*Doolin,* at p. 418.)

While ordinarily a nonindigent defendant has the right to be represented by the counsel of his choice, and may discharge retained counsel if he so chooses, the right to discharge retained counsel is not absolute.  (*People v. Lara* (2001) 86 Cal.App.4th 139, 152-153; *People v. Courts* (1985) 37 Cal.3d 784, 790 [the right to retain counsel of one's choosing can constitutionally be forced to yield when it significantly prejudices defendant himself or unreasonably disrupts the orderly processes of justice under the circumstances of a particular case].)  The court may exercise its discretion to prohibit a defendant from discharging retained counsel to ensure orderly and expeditious judicial

---

asserted conflict adversely affected counsel's performance.  Our Supreme Court in *Doolin* disapproved of *Frye* and its "informed speculation" test to evaluate state conflict of interest claims.  (*Doolin, supra*, 45 Cal.4th at pp. 421-422, & fn. 22.)

administration if the defendant is unjustifiably dilatory or arbitrarily desires to substitute counsel at the time of trial. (*Lara,* at pp. 152-153.)

2. *Motion to Withdraw as Counsel*

It is also within the sound discretion of the trial court whether to grant or deny a motion by an attorney to withdraw as counsel. (*People v. Sanchez* (1995) 12 Cal.4th 1, 37, disapproved on other grounds by *Doolin, supra*, 45 Cal.4th at p. 421, fn. 22; *People v. McKenzie* (1983) 34 Cal.3d 616, 629 (*McKenzie*), abrogated on other grounds by *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) Such a ruling will be reversed on appeal only on a clear showing of abuse of discretion. (*Sanchez,* at p. 37; *Mandell v. Superior Court* (1977) 67 Cal.App.3d 1, 4 [court has discretion to deny attorney's request to withdraw when withdrawal would result in an injustice or cause undue delay].)

3. *The Trial Court Did Not Abuse Its Discretion in Denying Defense Counsel's Motions to Withdraw Because No Actual Conflict Existed with Defendant*

Defendant contends the trial court abused its discretion in denying Attorney Carlos's motions to withdraw three weeks before trial, and again on the first day of trial, because Carlos harbored an actual conflict of interest in that he admitted he could not effectively communicate with defendant about the case, and, as a result, failed to secure witnesses and evidence defendant deemed critical to his defense. In his view, their difficult relationship deprived him of the effective assistance of counsel and the right to present a defense. We are not persuaded.

At the outset, we note that the trial court did not have to accept Carlos's declaration of an alleged conflict blindly without further inquiry into the merits of the claim. This is especially so since Carlos intimated to the court that he merely was having "buyer's remorse" for accepting the case based on his childhood relationship with defendant's father.

Defendant's reliance on *Aceves v. Superior Court* (1996) 51 Cal.App.4th 584, 591-592, where the appellate court found that the trial court had abused its discretion by

17

not accepting defense counsel's assertion of a conflict of interest when the attorney could not discuss the conflict without disclosing privileged material, is misplaced. Unlike in *Aceves*, the alleged conflict here was fully aired and the trial court correctly evaluated the merits of the asserted conflict.

The record, moreover, shows that Carlos and defendant *could* effectively communicate, but that defendant simply did not want to accept Carlos's honest assessment about the case and the admissibility of the evidence defendant sought to introduce. We cannot say the trial court abused its discretion in concluding that the difference of opinion between client and counsel did not rise to the level of an actual conflict requiring Carlos to withdraw.

" 'The duty of a lawyer both to his client and to the legal system, is to represent his client zealously *within the bounds of the law*.' " (*McKenzie, supra*, 34 Cal.3d at p. 631.) Once an attorney is appointed or retained to represent a client, "he assumes the authority and duty to control the proceedings. The scope of this authority extends to matters such as deciding what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or reject, what motions to make, and most other strategic and tactical determinations." (*Ibid.*) That defendant was frustrated with Carlos's assessment of what evidence was legally admissible, or that they disagreed about trial tactics, which fell squarely within Carlos's discretion to make, does not mean that the attorney-client relationship had broken down to such an extent so as to require the court to grant counsel's motion to withdraw.

The hearing regarding defendant's competency further belied Carlos's claim that defendant could not effectively communicate about the case for purposes of preparing for and participating at trial. As the court found, defendant had an acute grasp on the judicial process, could articulate the importance of various witnesses and pieces of evidence, and could communicate his desire to present a defense based on Jessica fabricating the sexual assault allegations.

Defendant made clear that he wanted to defend the charges by challenging Jessica's credibility. He claimed Jessica was a liar and had consented to the entire incident. That is precisely the defense that Carlos pursued on defendant's behalf. At trial, defendant himself repeatedly testified that Jessica was a liar, and that none of her testimony was believable. Carlos also argued in closing to the jury that Jessica was not credible because she made up the entire incident. Thus, any alleged difficulties between Carlos and defendant did not prevent Carlos from zealously advocating the defense defendant wanted to present to the jury.

This case is unlike *McKenzie, supra*, 34 Cal.3d 616, where the Supreme Court found the defendant was deprived of the effective assistance of counsel where the trial court improperly denied defense counsel's motion to withdraw even though counsel expressly refused to actively participate in his client's trial after claiming that certain trial court rulings made it impossible for him to effectively represent his client. (*Id.* at pp. 623-625.) There, counsel did not participate in jury selection, did not present or question any witnesses, and did not argue to the jury about the evidence presented. (*Ibid.*) Nothing even remotely similar occurred here.

Defendant attempts to show that Carlos's performance was deficient in several respects, but we conclude none are availing.[17] He first claims that Carlos did not "pull all his punches" because he did not investigate and subpoena all of the Life Wireless customers whom Jessica signed up for a free phone on December 30. He asserts they possibly could have testified that they saw him with Jessica on that date thereby proving she lied during her preliminary hearing and trial testimony when she said defendant did not go to work with her in Oroville on December 30.

---

[17] We note that defendant has not raised an ineffective assistance of counsel claim on appeal.

As defendant's previous appointed counsel also noted, that point was collateral to whether defendant drugged and sexually assaulted Jessica on December 31 or January 1. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9 [a collateral matter is " 'one that has no relevancy to prove or disprove any issue in the action' "].) Indeed, whether defendant went to work with Jessica on December 30 and December 31, as defendant claimed, or whether he only accompanied her to work on December 31, as Jessica testified, had little, if any, bearing on the sexual assault allegations the jury had to decide. (*Ibid.* [manager's testimony that she had not granted person permission to use the roof plainly had little, if any, tendency in reason to prove that the person in fact had not gone on the roof and, hence, that he testified untruthfully].)

Defendant's claim that Carlos should have further investigated evidence regarding Jessica's sexual history likewise falls short. As Carlos properly advised defendant, evidence of a complaining witness's sexual history is ordinarily not admissible by the defendant at trial in order to prove consent. (Evid. Code, § 1103, subd. (c)(1) ["opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct, or any of that evidence, is not admissible by the defendant in order to prove consent by the complaining witness"].) And to the extent evidence that a complaining witness has made false sexual assault claims in the past is relevant and admissible (Evid. Code, § 1103, subd. (c)(5)), it is not apparent that Jessica had made any such false claim. When the court asked during an in-camera hearing whether Jessica had filed a report with law enforcement alleging she had been raped, defendant said no. Defendant testified that when he asked Jessica whether her sister's husband had raped her after she woke up next to him naked after a night of drinking, she would not give him a

straight answer. Although defendant wanted to confront her sister's husband, defendant testified that Jessica was reluctant to do so.[18]

Defendant's contention that Carlos failed to investigate and secure an expert toxicologist to testify regarding Jessica's alleged differing reactions to drinking alcohol on the night of the incident and at some other unknown time with defendant's cousin is also without merit. As the trial court noted, it is doubtful that an expert could provide the type of testimony defendant sought.[19]

While a properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact (Evid. Code, § 801, subd. (a)), the expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1116-1117 (*Jennings*).) Moreover, "an expert's opinion that something *could* be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist in the case before the jury, does not provide assistance to the jury because the jury is charged with determining what occurred in the case before it, not hypothetical possibilities." (*Id.* at p. 1117.)

Among other things, determining the amount of alcohol Jessica allegedly consumed with defendant's cousin, how much she weighed at the time, what she had eaten previously or while drinking, and over what period of time the drinking occurred were all unknown, and, frankly, unknowable facts. Such an opinion, based largely on

---

[18] The record also shows that Carlos attempted to interview Jessica's brother-in-law, but that he would not give a statement.

[19] Romero, defendant's previous appointed counsel, submitted the blood-alcohol issue to an expert to consider. The record does not disclose the results of that consultation.

surmise and conjecture, would have been inadmissible because it would not have aided the jury. (*Jennings, supra*, 114 Cal.App.4th at pp. 1116-1117.)

Finally, the record supports the conclusion that the alleged difficulties between defendant and Carlos arose largely from defendant's improper attempts to delay trial and not from any actual conflict between them. As the trial court was well aware, defendant had a long history of creating conflicts with his appointed attorneys by threatening them and disregarding their tactical advice. When dissatisfied with his original appointed counsel, defendant wrote his mother that he would have to threaten or stab him in open court in order to get him dismissed. His next public defender also said defendant had threatened him when he told defendant that much of the information defendant wanted to present was not relevant. Carlos similarly advised defendant after he was retained.

"[T]he public and the courts have an interest in the orderly process of justice." (*People v. Brown* (1988) 203 Cal.App.3d 1335, 1340.) A criminal defendant cannot be allowed to bring the judicial system to a halt, and endlessly avoid trial by manufacturing alleged conflicts with his difficult behavior thereby prompting his counsel to withdraw and forcing the court to continue the trial. (*Ibid.* [defendant cannot avoid trial by informing defense counsel on the eve of trial that he intends to commit perjury to force his counsel to withdraw and to obtain a continuance to allow new counsel to prepare].)

A criminal defendant's right to retain new counsel, as previously noted, is not absolute. (*People v. Byoune* (1966) 65 Cal.2d 345, 346.) The court must carefully weigh the right against other values of substantial importance, including the orderly and expeditious administration of justice, with a view toward an accommodation reasonable under the facts of the particular case. (*Ibid.*) Here, at the time Carlos sought to withdraw three weeks before trial, defendant had already gone through two other attorneys with whom he was generally uncooperative and had even threatened. Under the particular circumstances of this case, the trial court reasonably viewed as suspect defendant's

unsubstantiated claim that a fourth attorney who was not present might possibly be willing to represent him such a short time before trial.

Having reviewed the entire record, we cannot say the trial court abused its discretion in denying attorney Carlos's motions to withdraw shortly before trial because we conclude no actual conflict existed between counsel and client. Defense counsel's lamentations regarding defendant's difficult personality notwithstanding, the record shows Carlos and defendant could still communicate about the defense defendant wanted to pursue, and that Carlos actually presented that defense to the jury during trial. The fact that two counts were dismissed after the jury failed to reach a verdict on those counts shows Carlos's defense partially succeeded. Under the circumstances presented here, defendant was not denied his right to the effective assistance of conflict-free counsel, nor was his right to present a defense violated.

**II**

***Admissibility of Prior Consistent Statements***

Defendant contends the trial court erred by permitting the prosecutor to enhance Jessica's credibility through the admission of her prior consistent statements to two witnesses because he never attempted to impeach her with a statement inconsistent with her testimony. In his view, it was error to allow the nurse who conducted Jessica's sexual assault exam to testify about statements Jessica made during the examination, and to allow a detective to testify about statements Jessica made when he responded to a prior incident of domestic violence involving defendant. This claim arises in the following factual setting.

A.    *Background*

1.    *Nurse Gibbs*

Over defense counsel's objection, the trial court permitted Marlena Gibbs, the sexual assault nurse who examined Jessica, to testify about the examination and statements Jessica made during the examination.

23

According to Gibbs, Jessica reported that she had not voluntarily ingested drugs or alcohol before the incident. Jessica also said she was "[t]old to take [a] bath during [the] event," that she was "[f]orced to drink alcohol," and that she "[w]oke up in [a] car [and had] [d]ifficulty remembering after waking up in [the] car." Jessica said defendant told her that she vomited by the bathroom. She also reported injuries to her head, neck, jaw, and left eye. She did not describe any anal or genital injury or pain. Jessica described being hit with a ruler, a toilet tank lid, and defendant's fists; defendant also choked or strangled her with both his hands. Jessica reported that defendant injected her with something he said was pain medication, and forced or coerced her into ingesting alcohol or drugs. Jessica described being choked and said she had trouble swallowing and breathing. Jessica reported that while defendant choked her, he said, "You are going to die, bitch. I'm going to prison."

When questioned whether she formed any opinions as a trained sexual assault examiner, Nurse Gibbs testified it was not her job to form an opinion on whether something did or did not happen, but rather to document what she was told. She did note that Jessica's facial skin and the roof of her mouth had petechiae, or popped blood vessels, which was indicative of choking. Nurse Gibbs also noted redness and bruising on her neck, and that sections of her hair appeared to be missing.

Nurse Gibbs testified that Jessica was not sure about vaginal penetration because she did not remember what happened between the time defendant made her drink the alcohol and when she woke up in the car, but that she was sure that defendant anally penetrated her. She was not sure if any oral copulation occurred.

Nurse Gibbs collected a blood-alcohol sample, a urine sample, and vaginal, cervical, and anal swabs for testing. She noted on her report that the physical findings were consistent with the history given by Jessica during the exam. Pictures taken during the exam showing bruises and a black eye were shown to the jury.

24

Nurse Gibbs conceded on cross-examination that she did not observe any internal or external injuries to the vagina or anus or surrounding tissue. She did not find any substances, like saliva or seminal fluid, that fluoresced under a special lamp. She testified that it would be less likely to find fluids on the body if someone had recently bathed.

In closing, the prosecutor noted the injuries that Nurse Gibbs documented during the sexual assault examination. The prosecutor did not reference or otherwise emphasize any statements Jessica made to Nurse Gibbs during the examination.

Regarding Nurse Gibbs's testimony, the trial court instructed the jury as follows: "Nurse Marlena Gibbs testified that in reaching her conclusion as an expert witness, she considered statements made by Jessica . . . . You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

### 2. *Detective Miller*

Defendant made a similar objection to the testimony of Detective Christopher Miller, arguing any statements Jessica made to him about a prior domestic violence incident with defendant in September 2007 were inadmissible hearsay. The court agreed that if the detective simply intended to report what Jessica has already testified to, his testimony would be inadmissible. But, in light of the prosecutor's representation that he investigated the incident and took photos of Jessica's injuries, his testimony was proper.

Defense counsel renewed his objection, questioning whether the prosecutor was merely attempting to have Detective Miller repeat Jessica's testimony. The prosecutor responded that counsel had cross-examined Jessica and challenged her credibility thereby making any prior consistent statements to Detective Miller admissible under Evidence Code sections 1236 and 791. Although defense counsel countered that he had not questioned Jessica about the incident nor challenged her credibility on it, the prosecutor argued he had impugned Jessica's motives and had explicitly and implicitly argued that

25

she was biased and essentially making up the current incident. Citing Evidence Code section 791, subdivision (b), the court agreed with the prosecutor and ruled Detective Miller's proposed testimony was admissible.

Detective Miller testified that on September 22, 2007, he interviewed Jessica in response to a reported domestic violence call. Jessica reported that defendant, her husband at the time, got mad about a trip she took to a casino with his brother and accused her of cheating on him; he hit her in the head, grabbed her hair, and wrapped a phone cord around her neck and choked her. A few hours later, he choked her again and threatened to kill her, demanding that she tell him the truth about cheating on him with his brother.

Detective Miller took photographs of Jessica that day, which were shown to the jury. The photos depicted bruising on her arm and redness on her chest. There were no visible marks on her neck.

B.      *Analysis*

Evidence Code section 1236 governs the admissibility of prior consistent statements by a witness. The statute provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with [Evidence Code] [s]ection 791."

Evidence Code section 791, in turn, provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] (a) Evidence of a statement made by him that is inconsistent with any part of his testimony at the hearing has been admitted for the purpose of attacking his credibility, and the statement was made before the alleged inconsistent statement; or [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by

26

bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Here, defendant argues Jessica's prior out-of-court statements to Nurse Gibbs and Detective Miller constituted hearsay that were not made admissible by Evidence Code section 791. Although defendant concedes he challenged Jessica regarding inconsistent statements from the preliminary hearing about when she first resumed seeing defendant, their trip on New Year's Eve, and purchasing lottery tickets, nothing she reported to Nurse Gibbs or Detective Miller rebutted these statements. And while he admits he challenged her on whether she reported to a detective about being injected by defendant, whether defendant hit her with a ruler, and whether she told an officer that "the sex on the first was consensual," defendant argues no actual evidence was offered of an inconsistency because his attorney's questions were not evidence.

Defendant repeatedly attacked Jessica's credibility, both during his testimony and in his counsel's closing arguments to the jury. Indeed, his entire defense was that she was a liar. For example, defendant testified that any question you asked her, she would "lie right to your face." Defense counsel also vigorously argued that Jessica fabricated the incident and that no part of her testimony should be believed. Counsel stated: "To begin with the [d]efense's position, there is absolutely no sex crimes committed in this case. None whatsoever. Jessica is lying." He surmised that Jessica made up the entire incident and was untruthful because she did not want to lose her job, her Section 8 housing, or her children. Contrary to defendant's contention, he essentially challenged her credibility on every aspect of her trial testimony, calling it into doubt by expressly and implicitly arguing that she lied.

Nevertheless, we need not decide whether Jessica's prior consistent statements satisfied the temporal or other requirements of Evidence Code section 791. Even if we assume that the court erred in admitting the statements despite defendant's numerous attacks on her credibility, we conclude any alleged error harmless under the facts of this

27

case.  (*People v. Andrews* (1989) 49 Cal.3d 200, 211 [admission of prior consistent statement deemed harmless error given other admissible evidence of the defendant's guilt].)  Apart from the testimony of Nurse Gibbs and Detective Miller, there was evidence from defendant himself that he had sexual relations with Jessica when he knew or should have known that she was not in a condition to consent. He described her as "shit faced drunk," "comatose," nonresponsive, and unable to walk.  There was evidence showing Jessica suffered physical injuries that were inconsistent with defendant's explanations.  Defendant acknowledged he had abusive relationships with Jessica and at least two other women where he grabbed them, put them in choke holds, and pulled their hair.  He was also convicted of a prior domestic violence offense against one of the women.

Moreover, Jessica's prior statements to Nurse Gibbs and Detective Miller were substantially similar to her testimony at trial and were largely cumulative.  (*People v. Andrews, supra*, 49 Cal.3d at p. 211 [any error in admitting prior consistent statement was in part harmless because it was cumulative of declarant's trial testimony].)  Based on all of these circumstances, it is not reasonably probable that admitting her prior consistent statements affected the verdicts.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

### III

### *Senate Bill No. 1393 - Prior Serious Felony Enhancement*

The Governor signed Senate Bill No. 1393 (2017-2018 Reg. Sess.) which, effective January 1, 2019, amends sections 667, subdivision (a) and 1385, subdivision (b) to allow a trial court to exercise its discretion to strike or dismiss a prior serious felony allegation for sentencing purposes.  (Stats. 2018, ch. 1013, §§ 1-2.)  Under the pre-2019 versions of these statutes, the court was required to impose a five-year consecutive term for "any person convicted of a serious felony who previously has been convicted of a serious felony" (§ 667, subd. (a)(1)), and the court had no discretion "to strike any prior

28

conviction of a serious felony for purposes of enhancement of a sentence under Section 667." (§ 1385, former subd. (b).)

Defendant contends Senate Bill No. 1393 applies retroactively to his case and that the matter should be remanded for resentencing to allow the trial court an opportunity to strike his prior serious felony enhancement, which the court found true. The People properly concede the matter. (See *People v. Jones* (2019) 32 Cal.App.5th 267, 272 [finding Senate Bill No. 1393 applies retroactively to judgments not yet final on appeal].) Accordingly, we remand the matter to the trial court to determine whether to exercise its discretion to strike the five-year prior serious felony enhancement.

## IV

### *Senate Bill No. 136 - Prior Prison Term Enhancement*

When defendant was sentenced in November 2017, the version of section 667.5, subdivision (b) in effect required a one-year enhancement for each prior prison term served for "any felony," with an exception not applicable here. (§ 677.5, former subd. (b).) While defendant's appeal was pending, the Legislature passed Senate Bill No. 136 (2019-2020 Reg. Sess.), which amended section 667.5, subdivision (b) to limit a prior prison term enhancement to people who have served a sentence for certain sexually violent offenses. (Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.) The amended provision states: "Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code, provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed

29

under subdivision (h) of Section 1170 or any felony sentence that is not suspended." (§ 667.5, subd. (b).)

The parties agree, and we concur, that Senate Bill No. 136 applies retroactively to cases not yet final on appeal because it ameliorates punishment for serving a prior prison term. (Accord, *People v. Matthews* (2020) 47 Cal.App.5th 857, 864-865 [Senate Bill No. 136 applies retroactively because it lessens punishment for a person who no longer qualifies for the enhancement]; *People v. Lopez* (2019) 42 Cal.App.5th 337, 340-342 [Senate Bill No. 136 applies retroactively to cases not yet final on appeal]; *People v. Jennings* (2019) 42 Cal.App.5th 664, 680-682 [same]; *In re Estrada* (1965) 63 Cal.2d 740, 745-748.) We also agree with the parties that defendant no longer qualifies for the three 1-year prior prison term enhancements because the trial court found he served three prior prison terms for convictions for resisting an executive officer with threat or force (§ 69), being a felon in possession of a firearm (former § 12021, subd. (a)(1)), and domestic violence (§ 273.5, subd. (a)). None of these convictions are sexually violent offenses. Therefore, upon remand, the trial court shall strike the three 1-year prior prison term enhancements and resentence defendant accordingly.

## V.

### *Ability to Request Continuance*

In supplemental briefing, defendant contends the trial court erred when it purportedly denied him the ability to request a continuance reasonably necessary to allow substitution of retained counsel thereby denying him his right to present the defense of his choosing. He contends the alleged error was structural mandating reversal without any showing of prejudice, or, at a minimum, that a modified prejudice analysis should apply, which he asserts he has met. We are not persuaded.

Defendant's argument rests on the novel theory that the trial court "prospectively" denied him the right to seek a continuance when, three weeks before trial, he commented during a hearing that Attorney Sidhu was allegedly willing to represent him if his family

30

paid him and the court responded that the trial date was still on given that Sidhu was not present. Defendant cites various authorities for the general proposition, previously discussed (see discussion, part I., *ante*), that a criminal defendant has a right to be represented by a counsel of his choosing subject to some limitations (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 [165 L.Ed.2d 409]; *People v. Crovedi* (1966) 65 Cal.2d 199), and that a criminal defendant's right to counsel includes the right to a reasonable continuance, when warranted, so that substitute defense counsel can adequately prepare for a defense at trial. (*People v. Courts* (1985) 37 Cal.3d 784, 789; *People v. Byoune* (1966) 65 Cal.2d 345, 346; *People v. Williams* (2021) 61 Cal.App.5th 627, 639-640.)

While we do not quarrel with these general principles, we note, as do the People, that the record shows defendant never moved for a continuance or to substitute Sidhu in as counsel before trial. Thus, the issue of a continuance was not properly before the court. The fact that on the eve of trial, when defendant had a history of threatening and not cooperating with his multiple previous attorneys, defendant mentioned that a different attorney might be willing to take his case, without the attorney present or any supporting documentation showing such an alleged willingness, does not mean defendant formally sought, or the court denied, a motion for a continuance to substitute counsel. Indeed, defendant mentioned Attorney Sidhu three weeks before trial, and yet never moved to substitute him as counsel or moved for a continuance during that time.[20] Thus, the trial court did not have any motions before it to address those issues. Based on this record, we

_____

[20] Defendant also refers to Attorney Grady Davis, whom his retained attorney Carlos mentioned that he had met with regarding a competency issue. But, as previously noted, the record does not support a finding that the court denied a request to substitute Attorney Davis to represent defendant, and we do not address that issue further here. (See fn. 15, *ante*.)

reject defendant's claim that the court prospectively denied him a continuance to substitute a different retained attorney.

## DISPOSITION

Defendant's convictions are affirmed. The matter is remanded for the trial court to determine whether to exercise its discretion to strike the five-year prior serious felony enhancement under section 667, subdivision (a). Upon remand, the trial court shall strike the three 1-year prior prison term enhancements under section 667.5, subdivision (b). The court shall prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.


　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　HOCH, J.



We concur:



/s/
BLEASE, Acting P. J.



/s/
ROBIE, J.